IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

In the Matter of the Complaint of GRAND §
CASINO OF MISSISSIPPI, INC.- BILOXI, §
for its Interest in And to the Vessels § 1:06-CV-195-LG-RHW
making up the Grand Casino Biloxi, for § In Admiralty (Pursuant to
Exoneration from or Limitation of Liability § FED. R. CIV. P. 9(h))

**MEMORANDUM OPINION AND ORDER OF
DISMISSAL FOR LACK OF ADMIRALTY JURISDICTION**

THIS MATTER COMES BEFORE THE COURT upon the Motions of Jerry Kelly and Marilyn Kelly d/b/a as the Tivoli Hotel, Cherri Porter, Sharon Coleman, Steve Scott, The Ohr - O'Keefe Museum of Art, Inc., K.R. Borries Construction Company, and Travelers Property Casualty Company of America, as subrogee of Shuffle Master, Inc., (collectively referred to as "Claimants") to Dismiss the above styled and numbered cause for Lack of Subject Matter Jurisdiction pursuant to FED. R. CIV. P. 12(b)(1). During Hurricane Katrina, high winds and unprecedented storm surge caused two dockside casino barges owned by Grand Casino of Mississippi, Inc. ("Grand Casino") to leave their moorings and travel inland where they caused damage to property at or near U.S. Highway 90 in Biloxi, Mississippi. Grand Casino has invoked the admiralty and maritime jurisdiction of the Court under 28 U.S.C. § 1333 and 46 U.S.C. § 740 and seeks exoneration from and/or limitation of liability pursuant to 46 U.S.C. § 183. Claimants seek dismissal of Grand Casino's Complaint. According to Claimants, the Court lacks admiralty jurisdiction over this action because Grand

Casino's gaming barges are not "vessels." Having considered the pleadings on file and the relevant legal authorities, it is the opinion of the Court that, as a matter of law, the Grand Casino's floating casino barges were not "vessels" and therefore, this matter should be dismissed for lack of subject matter jurisdiction.

## FACTS

Since the 1990's the Grand Casino has operated a hotel property and casino operation adjacent to the shore of the Mississippi Sound in Biloxi, Mississippi. The Grand Casino gaming area was comprised of two floating dockside barges.[1] The main gaming barge was approximately 600 x 110 feet. It was made up of six separate tank barges which were brought under tow to the Grand Casino site in the early 1990's. The six barges were welded together and converted into the main casino barge in 1993. The smaller was originally know as the LADY LUCK casino barge. The 180 x 110 foot structure was purchased by the Grand Casino, towed, and moored adjacent to the main Grand Casino barge in 1998. Both structures were held in place by a mooring cell system anchored in the seabed. Rigid collars were attached to each barge fitting around the cells allowing the barges to rise and fall with the tide while keeping them in place. Although the casino barges have emergency generators on site, they are essentially dependent upon shore-based utilities. There is no indication in the record that either barge has ever left its mooring at the Grand Casino site. Neither is there any indication that these barges have been used for any purpose, save as a gaming facility, since their arrival in Biloxi, Mississippi.

---

[1] An affidavit detailing the characteristics of both barges is attached to Grand Casino's Response and Opposition to Motions to Dismiss.

On August 29, 2005, Hurricane Katrina struck the Mississippi Gulf Coast.  Hurricane force winds and record storm surge caused both barges to break free of their moorings.  The main barge traveled in a northeasterly direction approximately 3,000 feet.  The smaller barge went in the same general direction approximately 4,000 feet.  When they came to rest, the barges had caused significant damage to Claimants' property located north of U.S. Highway 90 in Biloxi, Mississippi.  Salvage of the Grand Casino barges was limited to demolition and removal of debris.[2]

## DISCUSSION

The Limitation of Liability Act, 46 U.S.C. § 181 *et seq.*,  creates a procedure whereby the shipowner's liability for certain claims may be limited to the "value of the interest of such owner in such vessel"—the value at the termination of the voyage—and "freight then pending"—freight monies earned by the vessel owner during the voyage.  2 Admiralty & Mar. Law § 15-5 (4th ed.).  The Limitation Act does not confer jurisdiction upon federal courts.  That must come from our admiralty jurisdiction under U.S. Const. art. III, § 2 and 28 U.S.C. § 1333(1).  Suits lacking any relationship to either navigable waters or traditional maritime activity are without admiralty jurisdiction.  *Guillory v. Outboard Motor Corp.*, 956 F.2d 114, 115 (5th Cir. 1992).  The determination of whether an unconventional craft is a vessel is an issue that is generally resolved as a matter of law.  *Holmes v. Atlantic Sounding Co., Inc.*, 437 F.3d 441, 445 ( 5th Cir. 2006).

The question of whether the Grand Casino dockside gaming barges were "vessels" for purposes of admiralty jurisdiction is controlled by the Fifth Circuit's decision in  *Pavone v.*

---

[2]*See* Rivers and Gulf survey report, dated September 23, 2005.

*Mississippi Riverboat Amusement Corp.,* 52 F.3d 560 (5th Cir. 1995).  In *Pavone,* an employee of the BILOXI BELLE, a floating dockside casino moored in Biloxi, Mississippi, was injured while on the job.  Pavone filed an action alleging that he was injured on a Jones Act vessel.  Even though the barge floated on navigable waters, "its dockside side attachment to land" was "indefinite, if not permanent, save only for its ability to be unmoored and towed to sheltered waters in advance of approaching hurricanes or other violent weather.  It employed no navigational or nautical crew and all of its workers were employed solely in connection with the casino operation."  *Pavone*, 52 F.3d at 564 -565.  Finding that the BILOXI BELLE was not a vessel for purposes of the Jones Act or general maritime law the court held:

> When the undisputed facts of the instant cases are plugged into (1) the *Desper/Hawn* withdrawn-from-navigation factors, or (2) the *Bernard/ Gremillion* work-platform attributes, or both, and are compared to the functional and nautical characteristics and mooring statuses of the various craft that in earlier cases were held as a matter of law to be nonvessels for Jones Act purposes, there can be little doubt that indefinitely moored, shore-side, floating casinos, such as the BILOXI BELLE, must be added to that list. Here, the semi-permanently or indefinitely moored barge supporting the BILOXI BELLE casino was constructed ab initio to be the floating site of a restaurant and bar (not a key factor given *Ducrepont* 's recognition that original construction as a work-platform is not a prerequisite).  From its inception the instant barge was used first as a floating restaurant and bar until its conversion to a casino and its renaming as the BILOXI BELLE, after which it has been used only for casino purposes. Upon its arrival in Mississippi from Texas, the BILOXI BELLE was moored to the shore in a semi-permanent or indefinite manner, and continued to be thus moored before, during, and after the accidents in question. The BILOXI BELLE is susceptible of being moved, and in fact was moved across navigable waters one time in the course of "normal operations" (assuming that movement to avoid the threat of a hurricane on a single occasion can be deemed "normal operations"), which one-time movement was purely incidental to the barge's primary purpose of physically supporting a dockside casino structure.

*Id.* at 570. (footnotes omitted).  In  *Martin v. Boyd Gaming Corp.,* 374 F.3d 375 (5th Cir. 2004),  a replica 19th Century paddle-wheel steamer was used as a riverboat casino.  The vessel, TREASURE CHEST, held a valid certificate of inspection from the United States Coast Guard

and conducted gaming cruises.  After March of  2001 the vessel only conducted gaming activities while moored.  Martin, a cocktail waitress, filed a Jones Act claim when she was injured in a slip and fall.  She argued that unlike the vessel in *Pavone,* the TREASURE CHEST was designed and constructed as a vessel and sailed on Lake Pontchartrain.  The court disagreed.  "The rule has never been 'once a vessel, always a vessel...'  Once the TREASURE CHEST was withdrawn from navigation so that transporting passengers, cargo or equipment on navigable water was no longer an important part of the business in which the craft was engaged, the craft was not a vessel."  *Martin,* 374 F.3d at 377.

Grand Casino contends that the analysis used to determine vessel status has been substantially expanded by *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 125 S. Ct. 1118, 160 L.Ed.2d 932 (2005).  In *Stewart,* the Court determined that a harbor dredge was a vessel under the Longshore Harbors Workers' Compensation Act.  The Court stated that 1 U.S.C. § 3 provides the controlling definition of the term "vessel."  *Stewart,* 125 S.Ct. at 1129.   Under 1 U.S.C. § 3 "a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."  *Id.*  According to the Grand Casino, Fifth Circuit decisions which pre-date *Stewart* are no longer controlling on the issue.

Clearly, the *Stewart* decision "has significantly enlarged the set of unconventional watercraft that are vessels under the Jones Act and the LHWA."  *Holmes,* 437 F.3d at 448. However, Grand Casino's conclusion that *Stewart* somehow overrules *Pavone* and its progeny is, in the opinion of the Court, incorrect.  This argument was recently rejected in *De La Rosa v. St. Charles Gaming Co., Inc.,*___F.3d___,  No. 05-41563, 2006 WL 3743104 (5th Cir. 2006).  In *De La Rosa*, the sole issue before the court was whether the CROWN CASINO, a casino boat, was a

"vessel" under federal admiralty jurisdiction. First, the court held that *Stewart* had not overturned *Pavone*. *Id.* at *1. Citing *Stewart,* the court went on to state that "a watercraft is not capable of being used... in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* (quoting *Stewart,* 543 U.S. at 494, 125 S.Ct. 1118). The crucial question is "whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id.* The court concluded that:

> In this case, we are satisfied that although the CROWN CASINO was still physically capable of sailing, such a use was merely theoretical. The evidence presented to the district court reveals that the CROWN CASINO is indefinitely moored to the land by lines tied to steel pilings. It receives water, telephone lines, sewer lines, cable television and data processing lines from land-based sources. It has not been used as a seagoing vessel since March 28, 2001, when it was moored at its present location on Lake Charles, and the Defendants do not intend to use it as such. Rather, their intent is to use it solely as an indefinitely moored floating casino. Its operations are entirely gaming-related, and not maritime in nature.

*Id.* at *2; *see also Board of Commissioner Of The Orleans Levee District v. M/V Belle Of Orleans* 439 F.Supp.2d 1178 (S.D. Ala. 2006)(post *Stewart* case holding that a permanently moored riverboat casino is not a vessel). In the opinion of the Court, the functional and nautical characteristics and mooring status of the CROWN CASINO, as described by the court in *De La Rosa*, are indistinguishable from those of the Grand Casino gaming barges formerly moored in Biloxi, Mississippi. Therefore, since, as a matter of law, the Grand Casino barges were not "vessels," this Court lacks § 1333 jurisdiction.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motions of the Claimants to Dismiss [17, 30, 37] the above styled and numbered cause for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1) should be, and are, hereby

**GRANTED.**

**SO ORDERED AND ADJUDGED** this the 23rd day of January, 2007.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE